UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Joey Lynn Clark, | ) | Civil Action No. 8:23-cv-6175-JDA-BM |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Kenneth Nelson, *Warden*, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), the undersigned United States Magistrate Judge is authorized to review post-trial petitions for relief and submit findings and recommendations to the district court.

## BACKGROUND

Petitioner is currently incarcerated at the Broad River Correctional Institution in the South Carolina Department of Corrections ("SCDC"). ECF No. 1 at 1. On November 7, 2013, Petitioner was indicted by the Cherokee County Grand Jury for murder at case number 13-GS-11-1167. ECF No. 24-5 at 31–32. The case was prosecuted by Kimberly Leskanic ("Ms. Leskanic") and Jennifer Jordan ("Ms. Jordan") (collectively the "prosecutors"). H. Chase Harbin ("Mr. Harbin" or "trial counsel") represented Petitioner. ECF No. 24-1 at 3. Following a trial beginning on March 17, 2014, before the Honorable Howard P. King, a jury found Petitioner guilty of murder. ECF No. 24-5 at 19. Judge King thereafter sentenced Petitioner to a term of forty-five years. *Id.* at 29.

**Underlying Case Facts**

According to the State, on December 1, 2010, Winter Wingard ("Ms. Wingard") lived in a doublewide trailer off Songbird Lane in Cherokee County with her mother, Beverley Patrick ("Ms. Patrick"). ECF No. 24-1 at 124–127. Petitioner, who was Ms. Wingard's former boyfriend, had previously lived with Ms. Wingard and Ms. Patrick but had been asked to move out when the relationship ended a few months earlier. *Id.* at 126–31. Despite being asked to move out, Petitioner still frequented the home. *Id*. Ms. Wingard had begun dating Anna Mooney ("Ms. Mooney"), a young woman who lived in Georgia. *Id.* at 131–32, 180–81. Petitioner, Ms. Wingard, and Ms. Mooney all exchanged regular text messages back and forth, with Petitioner repeatedly trying to interfere in Ms. Wingard and Ms. Mooney's relationship. *Id.* at 178–204. At one point, Petitioner falsely told Ms. Mooney that Ms. Wingard had AIDS. *Id*.

Petitioner and Ms. Patrick worked together at a construction company, and both worked on December 1. ECF No. 24-1 at 126–27, 137–39. After work, Petitioner and Ms. Patrick went to a friend's house to pick up a quart of moonshine and pizza before heading back to the trailer on Songbird Lane. *Id.* at 138–40. When they arrived, Ms. Wingard was sick with bronchitis and had a fever of 104 degrees. *Id.* at 140–41. Ms. Wingard was upset that Petitioner was drinking moonshine for fear of how he would behave while intoxicated. *Id.* at 140. After eating pizza and drinking approximately three shots of moonshine, Ms. Patrick left Ms. Wingard on the couch and went to bed around 10:00 p.m., expecting that Petitioner would not be spending the night. *Id.* at 140–42. Ms. Wingard attempted to send a text message to Ms. Mooney at 2:14 a.m. that was interrupted, likely by her phone losing power or having the battery removed. ECF No. 24-2 at 163–65. This was the last text message attempted from Ms. Wingard's phone. *Id*.

At approximately 4:00 a.m. the next morning, Ms. Patrick was awoken by her alarm.  ECF No. 24-1 at 142–43.  Ms. Patrick found Petitioner standing at the foot of her bed, which was unusual because he was usually not awake at that time.  *Id*.  Petitioner told Ms. Patrick that Ms. Wingard left the house during the night to get cigarettes and never returned home.  *Id.* at 143.  Petitioner also told Ms. Patrick that he suspected that Ms. Wingard had really left to visit Ms. Mooney.  *Id*.  Ms. Patrick tried to call Ms. Wingard numerous times without success and eventually rode to work with Petitioner.  *Id.* at 144–45.

Ms. Patrick received several text messages from Petitioner throughout the day, including a message indicating that he left work early but would be back to pick Ms. Patrick up when she finished working.  ECF No. 24-1 at 145.  Petitioner later returned to pick up Ms. Patrick, and after visiting the house where Petitioner was supposed to be living, they returned to the trailer on Songbird Lane.  *Id.* at 146.  Petitioner was helping Ms. Patrick dispose of old tomato plants when he announced that he noticed that Ms. Patrick's car was parked down the road at a neighbor's home.  *Id.* at 146–47.  Petitioner and Ms. Patrick went to the vehicle and discovered Ms. Wingard's purse was in the front seat.  *Id.* at 147–48.  However, Ms. Wingard's keys were not in the vehicle.  *Id*.  Ms. Patrick asked a neighbor when her car appeared, and the neighbor said that it was parked there when he woke up that morning.  *Id.* at 148.  Another neighbor later reported that he noticed Ms. Patrick's vehicle was parked in this location when he returned from work around 2:20 a.m. on December 2.  *Id.* at 218; ECF No. 24-2 at 1.  Ms. Patrick called 911, and law enforcement arrived shortly thereafter.  ECF No. 24-1 at 148, 165.

A few hours earlier on December 2nd, James Wilkerson ("Mr. Wilkerson") was driving on Mikes Creek Road when he saw what he thought was a blow-up doll.  ECF No. 24-2 at 5–6.  When Mr. Wilkerson got closer, he discovered that it was not a doll but Ms. Wingard's nude body with

sweatpants pulled down around her ankles. *Id.* at 5–6, 12. Mr. Wilkerson did not have cell phone service, so he left the scene to get assistance. *Id.* at 7. Mr. Wilkerson found Clarence Taylor ("Mr. Taylor"), who went to the scene at Mikes Creek and confirmed what Mr. Wilkerson had reported. *Id.* at 12–13.

Mr. Taylor called 911 and waited for law enforcement to arrive. ECF No. 24-2 at 12–13. Investigator Jimmy Henson ("Investigator Henson") of the Cherokee County Sherriff's Department arrived and began processing the body and the scene at Mikes Creek. *Id.* at 15, 23–24. Investigator Henson noticed that Ms. Wingard's body and sweatpants were smeared with reddish colored soil, which was inconsistent with the soil at Mikes Creek. *Id.* at 26–29, 36. It appeared as though someone had dragged Ms. Wingard's body to her final resting place near a barbed wire fence. *Id.* at 33–36, 42. Ms. Wingard had also been stabbed thirteen times. *Id.* at 31; ECF No. 24-3 at 40. Investigator Henson collected several items for testing, including briars and tree limbs near the body. ECF No. 24-2 at 37–40.

Investigator Henson and other law enforcement officers also processed the trailer at Songbird Lane. ECF No. 24-2 at 71–72. Investigator Henson noted that the soil at Songbird Lane was reddish colored, much like the soil smeared on Ms. Wingard's body and clothing. *Id.* at 75–76. Officers recovered Ms. Wingard's cell phone with the battery removed, the cell phone battery, and the keys and remote to Ms. Patrick's car in the vegetation surrounding the trailer. *Id.* at 76–77, 88. Officers processed various areas of the trailer and found no signs of Ms. Wingard's or Petitioner's blood inside. *Id.* at 84–85.

Law enforcement also processed Ms. Patrick's car. ECF No. 24-2 at 93. Fingerprints of reddish soil were found on the driver's side and passenger's side. *Id.* at 95–96. The car was dusted for fingerprints, and Petitioner's print was identified on the rear quarter panel of the car. *Id.* at 102.

Other fingerprints recovered did not match Petitioner, Ms. Wingard, or Ms. Patrick. *Id.* at 111–12; ECF No. 24-3 at 72. Spatter of Ms. Wingard's blood was discovered on the passenger door and dashboard. ECF No. 24-2 at 104.

Petitioner was arrested on December 6th for an unrelated traffic violation. ECF No. 24-2 at 182. While Petitioner was in the detention center, several inmates housed with him reported to law enforcement that he made incriminating statements implicating himself in Ms. Wingard's murder. *Id.* at 188–98; ECF No. 24-3 at 9–18. Many of these statements had internal inconsistencies and did not fully comport with the evidence and investigation underway. ECF Nos. 24-2 at 188–89; 24-3 at 9–18. Petitioner was charged with Ms. Wingard's murder shortly thereafter. ECF No. 24-3 at 18–19.

A pathologist testified that an autopsy of Ms. Wingard's body revealed that she died from "blunt force injury to the head with the bleeding around the brain, with in addition the bleeding from [the stab] wounds." ECF No. 24-3 at 40. Petechiae was also noted in Ms. Wingard's eyes, indicating that she was strangled, but this was not the cause of death. *Id.* at 37–40. The pathologist could not pinpoint a time of death but testified that her findings would be consistent with a time of death between 2:00 a.m. and 3:00 a.m. on December 2nd. *Id.* at 45.

Fibers recovered from the scene at Mikes Creek were later determined to be consistent with the fibers on Wolverine boots similar to those found in the trailer at Songbird Lane. ECF No. 24-4 at 5–13. Ms. Patrick testified that these Wolverine boots were owned by Petitioner. ECF No. 24-1 at 157. Additionally, DNA analysis determined that Petitioner could not be excluded as a contributor to a DNA mixture recovered on a briar from Mikes Creek or a DNA mixture recovered from a tree limb at Mikes Creek. ECF No. 24-4 at 63–66. An agent for the South Carolina Law Enforcement Division ("SLED") testified that she "would expect approximately 99 percent of the

population, if you randomly tested individuals, to be excluded" as contributors to these DNA

mixtures. *Id.* at 64–65. Petitioner was also a major DNA contributor to a DNA mixture recovered

from an oral swab of Ms. Wingard's mouth, identified as semen. *Id.* at 67–71.

### Direct Appeal

Petitioner, represented by Mr. Harbin, filed a notice of appeal on April 17, 2014.[1]  On

December 1, 2014, Petitioner, represented by Robert Pachak ("Mr. Pachak") filed an *Anders*[2] brief,

raising the following issue: "Whether the trial court erred in failing to give a correct and complete

jury instruction on circumstantial evidence?"  By letter dated December 4, 2014, the Court of

Appeals of South Carolina explained the *Anders* brief and allowed Petitioner 45 days to file a *pro*

*se* brief addressing any additional issues that he believed the Court should consider.  Petitioner

filed two *pro se* briefs on January 20, 2015, raising the following issues:

1. Whether the trial court erred in allowing the State to enter
   into evidence, statements from Inmates without them taking
   the stand and allowing the defendant to confront his
   accusers?

2. Whether the trial court erred in failing to allow the defendant
   to introduce any evidence or mentioning anything about
   "Third-Party Guilt?"

3. Whether the trial court erred in failing to give a correct and
   complete jury instruction on circumstantial evidence?

---

[1] The undersigned takes judicial notice of information related to Petitioner's direct appeal, which was not included in the record.  South Carolina Appellate Case Management System, https://www.sccourts.org/ACMS/index.cfm (last visited August 15, 2024).  *See Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of matters of public record."); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the content of court records.'").

[2] *Anders v. California*, 386 U.S. 738 (1967).

The Court of Appeals summarily dismissed Petitioner's appeal on August 19, 2015. The remittitur was sent to the Cherokee County Clerk of Court on September 9, 2015.

### PCR Application

On July 20, 2016, Petitioner, represented by Joel Stroud ("Mr. Stroud" or "PCR counsel") filed an application for post-conviction relief ("PCR"), raising the following grounds:

1. Ineffective Assistance of Counsel

   a. Counsel's cross examination of Detective Burgess "sabotaged any chance that [Applicant] had in getting a fair trial."
   b. Counsel's "closing argument reinforced the jury's impression that [Applicant] had confessed to the murder of [the victim]."
   c. Counsel failed to move to suppress or object to inmate statements being admitted into evidence.
   d. Allowed inadmissible hearsay statements to be admitted during the trial.
   e. "[Counsel's] failure to object left [Applicant's] direct appeal attorney no alternative other than to file an <u>Anders</u> brief because no issues were preserved for appellate review."
   f. Counsel failed to request a directed verdict.
   g. Counsel failed to object to State's improper closing argument.
   h. "[Counsel] failed to either request that the State test the fingernail clippings or request funding from the State to have the clippings DNA tested."
   i. Counsel "failed to either request that the State DNA test the cigar butts or request funding from the State to have the cigar butts tested."
   j. Counsel failed to call a DNA expert to testify.
   k. Counsel failed to develop trial strategy or adequately communicate to Applicant the theory of defense.
   l. Counsel "failed to request that Judge King add voluntary murder as a lesser included charge to the substantive law, as well as adding voluntary manslaughter, guilty or not guilty, to the verdict form."
   m. Counsel failed to present any evidence of manslaughter/heat of passion.

n.  Counsel offered improper advice to Applicant "about whether to accept or reject the State's voluntary murder plea offer."

o.  Counsel mailed Applicant a letter advising him of the plea offer, but Applicant never received the letter and never discussed the plea offer with Counsel.

p.  Counsel failed to request a pre-trial hearing to determine whether sufficient probable cause existed to arrest Applicant for murder.

q.  Counsel failed to object to the jury charge that malice could be implied by the use of a deadly weapon.

r.  Counsel failed to renew his request to withdraw after Judge Kelly refused his initial request to withdraw, even after receiving a threat of great bodily harm from Applicant.

s.  Counsel failed to put on defense in order to have the last closing argument.

t.  Counsel failed to request a mistrial.

u.  Counsel failed to object to the excessive use of graphic pictures that went beyond and were not necessary for the proof of the State's case.

v.  Counsel failed to request a change of venue based on the highly publicized murder in Cherokee County.

w.  Counsel failed to retain a "expert witness soil scientist" to compare and analyze the red dirt found on the victim's body.

x.  Counsel failed to request sequestration of the State's witnesses.

y.  Counsel failed to request a jury view of the crime scene.

z.  Counsel failed to investigate or present mitigating evidence.

aa. Counsel failed to strike juror who Applicant claims was present during his polygraph examination.

2.  Prosecutorial Misconduct

a.  "The Assistant Solicitor committed prosecutorial misconduct when she impermissibly bolstered and impermissibly vouched for the credibility of the crime scene investigators and again told the jury that [Applicant] confessed."

b.  "The State committed prosecutorial misconduct when it impermissibly allowed Detective Burgess to read the inmate statements into evidence.["]

     c. "The State also committed prosecutorial misconduct in its closing argument when it impermissibly referenced the statements of the inmates, as well as, impermissibly bolstering the credibility of the State's investigators and offering improper state of mind speculations regarding [Applicant's] reasons about why he would cooperate with the police investigators. [Assistant Solicitor] Leskanic offered no foundational support for these improper state of mind speculations."

     d. "The State committed prosecutorial misconduct when it failed to perform DNA testing of fingernail clippings found underneath the fingernails of the victim."

     e. "The State committed prosecutorial misconduct when it failed to perform DNA testing of cigar butts found in the yard at the victim's house, even though neither [Applicant], nor the victim and residents of the house smoked cigars."

3. The trial transcript does not reflect the actual order of testimony of the State's witnesses.

ECF Nos. 24-5 at 35–70; 24-8 at 89–91.

The State filed its return and partial motion to dismiss on May 18, 2017. ECF No. 24-5 at 84–89. An evidentiary hearing was held from June 19th to 21st, 2018, before the Honorable Grace Gilchrist Knie ("the PCR court"). *Id.* at 91. Petitioner was present at the hearing and represented by Mr. Stroud. *Id.* The State was represented by Megan Jameson and Jordan Cox of the South Carolina Attorney General's Office. *Id.* Ted Landreth (Investigator), Megan Clement (DNA Consultant), John Thorp (Soil Classification Expert), Mr. Harbin, Petitioner, Ms. Leskanic, and Ms. Jordan testified at the hearing. *Id.* at 109–176; ECF Nos. 24-6 at 1–152; 24-7 at 3–184; 24-8 at 30.

During the PCR hearing, Mr. Harbin testified that there were four jailhouse informants who provided statements. ECF No. 24-6 at 101. One informant was incarcerated in North Carolina, and three informants were "on the street in the Gaffney area." *Id.* at 101–02. Mr. Harbin testified

that his investigator went to speak with the informant incarcerated in North Carolina, but this informant "was not going to be a witness that we wanted to put on the stand. And he . . . was speaking in kind of those terms. Kind of warning us off if you will." *Id.* at 102. Mr. Harbin was able to locate two of the remaining three informants. *Id.* Mr. Harbin testified as follows:

> One was very combative, . . . and did not want me on his property. . . . I knocked on his trailer door, and he started yelling and telling me I . . . wasn't allowed to talk to him, and I wasn't allowed to be there . . . So, I didn't actually speak to him . . . I just saw him. But certainly I took that as somebody that I was not gonna consider a potentially helpful witness.
>
> . . .
>
> The third one . . . [,] I was able to speak with him at his parent's house, and he was I'll say helpful, but extremely, extremely reluctant, and inconsistent, and . . . the manner in which he would have been helpful would have been to have to present to the jury some conspiracy that the police had concocted this, which I know that's not a . . . thing to be taken lightly.
>
> . . .
>
> [I]t was not something that I wanted to do unless that was something we could go full boar with, and, . . . I had simply no proof of that other than this kind of wishy washy younger apparently kind of scared and confused kid.

*Id.* at 102–03. Mr. Harbin testified that the informants' statements were all inconsistent and contained information that did not fully comport with the evidence and investigation. *Id.* at 103–04. Mr. Harbin believed that one informant "would look like just a flatout liar." *Id.* at 104. Moreover, Mr. Harbin believed that if he could "pick apart [the other informants'] words on a statement and avoid the ability for them to rehabilitate themselves, that … might be the biggest win that we could get." *Id.* Mr. Harbin testified that he did not believe that one of the State's witnesses, Detective Richard Burgess ("Detective Burgess"), appeared overly credible before the jury, and at that point, Mr. Harbin did a risk versus benefit analysis and determined that he would

intentionally open the door to the informants' statements. *Id.* at 104–24. Mr. Harbin wanted the State to be "boxed in" with the informants' statements and not call the informants to the stand because he was concerned that they would lie and rehabilitate themselves to correct their inconsistencies. *Id.* at 104–24. Mr. Harbin thought that their statements sounded "made up." *Id.* The prosecutors also testified that prior to Mr. Harbin opening the door to the informants' statements, their intent was to call the informants as witnesses in the trial. ECF No. 24-7 at 142–44. The informants had been subpoenaed and were present in the courtroom during the trial. *Id.* However, after Mr. Harbin opened the door, the prosecutors decided to proceed with "the strongest part of [their] case," which they believed was "the DNA, the crime scene, and the forensics." *Id.*

By written order filed on August 29, 2018, the PCR court denied and dismissed Petitioner's PCR application, finding that Petitioner failed to establish any constitutional violations or deprivations that would require the court to grant his application. ECF No. 24-8 at 84–113.

## PCR Appeal

Petitioner, represented by Mr. Stroud, filed a notice of appeal before the Supreme Court of South Carolina on September 7, 2018. ECF No. 24-9 at 1–2. Katherine Hudgins ("Ms. Hudgins" or "PCR appellate counsel") subsequently filed a petition for writ of certiorari on April 24, 2019, presenting the following issue:

> Did the PCR judge err in refusing to find trial counsel ineffective for asking the investigator about statements made by five jail house snitches, who did not testify at trial, claiming that Petitioner confessed to killing the deceased and then not objecting when the State moved to introduce the written copies of the statements because these decisions by trial counsel cannot be part of a valid, reasonable trial strategy and resulted in prejudice?

ECF No. 24-10 at 1–16. On September 20, 2019, the Supreme Court transferred the case to the Court of Appeals. ECF No. 24-11. The Court of Appeals granted certiorari and filed an opinion

affirming the decision of the PCR court on November 1, 2023. ECF No. 24-12 at 1–2. The remittitur was sent to the Cherokee County Clerk of Court on November 28, 2023. ECF No. 24-13 at 1.

<strong>Federal Petition</strong>

On December 1, 2023, Petitioner filed the instant § 2254 petition, raising the following grounds for relief:

> **GROUND ONE:** Ineffective Assistance of Trial Counsel, and Prosecutorial Misconduct
>
> (a) Petitioner was denied the right to effective assistance of counsel guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §3, and §14 of the South Carolina Constitution.
> (b) Petitioner was denied the right to effective assistance of counsel when trial counsel allowed inadmissible statements to come in as a result of *Crawford*, 541 U.S. 26, violations.
> (c) Petitioner was denied the right to effective assistance of counsel when trial counsel allowed inadmissible SCRE Rule 802, hearsay statements to be admitted during the trial.
> (d) The State committed prosecutorial misconduct in its closing arguments, as well as in allowing Detective Richard Burgess to read inmate statements into the record in the State's re-direct, and offered improper state of mind speculation during closing with no proper foundation.
> (e) The State failed to perform DNA testing of fingernail clippings found underneath the fingernails of the victim, and defense counsel, Mr. Harbin failed to either request that the State test the fingernail clippings or request funding from the State to have the clippings DNA tested. See Trial Transcript Pages 640 through 641.
> (f) The State failed to perform DNA testing of cigar butts found in the yard at the victim's house, even though neither Mr. Clark, nor the victim and residents of the house smoked cigars. Defense Counsel, Mr. Hartman, failed to either request that the State DNA test the cigar butts or request funding from the State to have the cigar butts tested for DNA. See Trial Transcripts Page 278 Lines 01-03.
>
> **GROUND TWO:** The PCR Court erred in refusing to find trial counsel ineffective for asking the investigator about statements made by five jail house snitches, who did not testify at trial, claiming

that Petitioner confessed to killing the deceased and then not objecting when the State moved to introduce the written copies of the statements in evidence because these decisions by trial counsel cannot be part of a valid, reasonable trial strategy and resulted in prejudice.

**GROUND THREE:** The trial court erred in failing to give a complete jury instruction on circumstantial evidence.

**GROUND FOUR:** The trial court erred in allowing the State to enter into evidence statements from inmates without them taking the stand and allowing the defendant to confront his accusers.

**GROUND FIVE:** We see that the trial court erred in failing to allow the defendant to introduce any evidence or mentioning anything about "Third-Party Guilt."

**GROUND SIX:** The trial court erred in failing to give a correct and complete jury instruction on circumstantial evidence.

**GROUND SEVEN:** State PCR counsel offered ineffective assistance of counsel violating petitioner's U.S. Const. Amends. 5th, 6th, and 14th rights when he failed to act on behalf and in request to Mr. Clark's desire that counsel file a Rule 59(e) motion concerning Clark's PCR claims.

**GROUND EIGHT:** The S.C. Appeals Court affirmed Petitioner's conviction incorrectly claiming trial counsel was not ineffective for "opening the door" to the introduction of statements from five jailhouse informants claiming that the State presented extensive evidence of Petitioner's guilt when in fact the evidence did not prove Petitioner's guilt but instead his innocence and evidence of unidentified third parties gui[l]t was present, violating Petitioner's 6th Amendment rights to effective assistance of counsel and his 5th Amendment rights to a fair trial and due process g[u]aranteed by the U.S. Const[i]tution.

ECF Nos. 1 at 8; 1-3 at 1–2; 1-4 at 1–35; 1-5 at 1–34; 1-6 at 1–10; 1-7 at 1–2; 1-8 at 1–2; 1-9 at 1–3; 1-10 at 1–3; 1-11 at 1–3; 1-12 at 1–3; 1-13 at 1–20.

On February 6, 2024, Respondent filed a motion for summary judgment and return and memorandum.  ECF Nos. 24; 25.  On February 7, 2024, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Petitioner was advised of the motion to dismiss and motion for summary

judgment procedures and the possible consequences if he failed to respond adequately. ECF No. 26. Petitioner filed a response on April 3, 2024, indicating in part that Respondent only addressed four of the eight grounds he raised in his petition. ECF No. 36 at 2–3. On April 16, 2024, the undersigned issued a text order directing Respondent to file a supplemental return and memorandum addressing all eight grounds raised in the petition. ECF No. 43. Respondent filed a supplemental return and memorandum on May 16, 2024, to which Petitioner filed a response on June 12, 2024. ECF Nos. 48; 51. This matter is now ripe for review.

## APPLICABLE LAW AND ANALYSIS

### Summary Judgment Standard

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.

14

*Id.* at 324.  Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue.  *Id.*  Under this standard, the existence of a mere scintilla of evidence in support of a plaintiff's position is insufficient to withstand a defendant's summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

## Section 2254 Standard

Because Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended.  *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir. 1998).  Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Williams v. Taylor*, 529 U.S. 362, 410 (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

on the correctness of the state court's decision," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101-102 (2011) (citations omitted). Moreover, state court factual determinations are presumed to be correct, and Petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### Exhaustion and Timeliness

Respondent acknowledges that Petitioner has technically exhausted his state court remedies and that his petition is timely. ECF No. 48 at 13–15.

### Procedural Default

Procedural default is the doctrine applied when a petitioner seeks habeas corpus relief on an issue after he failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts. In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). Bypass can occur at any level of the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion. If a prisoner has failed to present his claim to the state's highest court and the state's highest court would now find that claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas review. Additionally, if the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the Supreme Court has explained:

> [State procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims

> together, as quickly after trial as the docket will allow, and while the
> attention of the appellate court is focused on his case.

Reed v. Ross, 468 U.S. 1, 10–11 (1984).

"[A] federal court ordinarily may not consider claims that a petitioner failed to raise at the time and in the manner required under state law unless 'the prisoner demonstrates cause for the default and prejudice from the asserted error.'" *Teleguz v. Pearson*, 689 F.3d 322, 327 (4th Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 536 (2006)). To show cause, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), or that "the factual or legal basis for the claim was not reasonably available to the claimant at the time of the state proceeding." *Roach v. Angelone*, 176 F.3d 210, 222 (4th Cir. 1999). "Alternatively, Petitioner may prove that failure to consider the claims will result in a fundamental miscarriage of justice." *McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). A fundamental miscarriage of justice equates to the conviction of someone who is actually innocent. However, "actual innocence" requires "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), the Supreme Court carved out a "narrow exception" that modified the "unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." In *Martinez*, the Court

> read *Coleman* as containing an exception, allowing a federal habeas
> court to find "cause," thereby excusing a defendant's procedural
> default, where (1) the claim of "ineffective assistance of trial
> counsel" was a "substantial" claim; (2) the "cause" consisted of
> there being "no counsel" or only "ineffective" counsel during the
> state collateral review proceeding; (3) the state collateral review
> proceeding was the "initial" review proceeding in respect to the

"ineffective-assistance-of-trial-counsel claim"; and (4) state law
requires that an "ineffective assistance of trial counsel [claim] . . .
be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14–18).  The Court in

*Martinez* also noted:

When faced with the question whether there is cause for an apparent
default, a State may answer that the ineffective-assistance-of-trial-
counsel claim is insubstantial, i.e., it does not have any merit or that
it is wholly without factual support, or that the attorney in the initial-
review collateral proceeding did not perform below constitutional
standards.

566 U.S. at 15–16.

## Ground One

As set out above, Petitioner raises numerous ineffective assistance of counsel and

prosecutorial misconduct claims in Ground One.  However, except for his claim that his trial

counsel was ineffective for allowing the jailhouse informants' inadmissible statements to be

entered into evidence, Petitioner did not raise his claims in Ground One to the South Carolina

appellate courts.  Accordingly, Petitioner's claims not presented to the South Carolina appellate

courts are procedurally defaulted.  *See e.g., Mahdi v. Stirling*, 20 F.4th 846, 893 (4th Cir. 2021)

("[A] claim is procedurally barred if the petitioner fail[s] to raise [it] in his petition for certiorari

to the South Carolina Supreme Court for review of the State PCR Court's decision.") (citation and

internal quotation marks omitted); *Horner v. Nines*, 995 F.3d 185, 208 (4th Cir. 2021) (finding,

when a petitioner failed to appeal one of his PCR claims to the PCR appellate court, that the

petitioner failed to present this claim "to the state appellate court face-up and squarely" and had

"procedurally defaulted federal habeas review of the claim.") (internal quotation marks omitted);

*Aiken v. Reynolds*, No. 6:15-cv-03270-RBH, 2016 WL 5661696, at *4 (D.S.C. 2016) ("To the

extent Petitioner alleges in Ground One that the evidence presented at trial was insufficient to

sustain his conviction for first-degree burglary, this claim is procedurally defaulted because . . . this issue was not presented on direct appeal or in Petitioner's petition for writ of certiorari from the denial of his PCR application."). Regarding Petitioner's ineffective assistance of counsel claim about the admissibility of the jailhouse informants' statements, which Petitioner did raise to the South Carolina appellate courts in his PCR appeal, Petitioner also raised the substance of this claim in Grounds Two and Eight. Accordingly, the undersigned has addressed the merits of that claim below.

Petitioner argues that his procedurally defaulted claims should still be considered because it was his PCR appellate counsel's fault for failing to present those claims in his PCR appeal. ECF No. 36 at 18–19. However, ineffective assistance of PCR appellate counsel cannot excuse procedural default. *See Johnson v. Warden of Broad River Corr. Inst.*, No. 12-7270, 2013 WL 856731, at *1 (4th Cir. Mar. 8, 2013) ("[B]ecause Johnson alleges only ineffective assistance of appellate postconviction counsel, his allegations do not constitute cause for his failure to exhaust under the limited exception in *Martinez*. Instead, his claims fall under the general *Coleman* rule that ineffective assistance of postconviction counsel cannot constitute cause for procedural default."); *Crowe v. Cartledge*, No. 9:13-cv-2391-DCN, 2014 WL 2990493 at *6 (D.S.C. July 2, 2014) ("[I]neffective assistance of PCR appellate counsel is not cause for a default.").

Petitioner also argues that he is actually innocent and the failure to consider his procedurally defaulted claims will result in his continued imprisonment for a crime he did not commit. ECF No. 51 at 8. Petitioner alleges that he owns "Brama" boots and the Wolverine boots collected by the detectives belonged to Ms. Patrick. ECF Nos. 36 at 10–11; 51 at 2, 8. Petitioner further alleges that the Wolverine boots would not fit his feet and there are photos of Ms. Patrick wearing the Wolverine boots and him wearing the "Brama" boots. ECF No. 36 at 11–12.

Moreover, Petitioner contends that the State found unidentified, third-party DNA and fingerprints ECF No. 51 at 2–3, 9.

"[I]n order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999). Claims of actual innocence are subject to a demanding standard. *Wilson v. Greene*, 155 F.3d 396, 405 (4th Cir.1998). To be credible, Petitioner's actual innocence claim must be supported by "new reliable evidence ... that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir.1999). A "petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

Petitioner's allegations fail to meet the demanding standard of showing actual innocence. The record reflects that the reddish colored soil smeared on Ms. Wingard's body and clothing was inconsistent with the soil at Mikes Creek Road but consistent in color with the soil at Songbird Lane. Fingerprints with this reddish colored soil, which matched Petitioner, were also found on Ms. Patrick's vehicle. Moreover, spatter of Ms. Wingard's blood was found inside of the vehicle. Further, five jailhouse informants wrote statements indicating that Petitioner made incriminating statements while incarcerated, which implicated himself in Ms. Wingard's murder. Petitioner also could not be excluded as a contributor to DNA mixtures found on a briar and a tree limb at Mikes Creek Road. A SLED agent testified that she "would expect approximately 99 percent of the population, if you randomly tested individuals, to be excluded" as contributors to these DNA mixtures. Petitioner was also a major DNA contributor to a DNA mixture recovered from an oral swab of Ms. Wingard's mouth, identified as semen. Accordingly, regardless of the ownership of

the Wolverine boots and the presence of unidentified DNA and fingerprints, the undersigned finds that Petitioner has failed to show that in light of any new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.  Therefore, Petitioner has failed to show actual innocence to excuse his procedural default, and this court should grant Respondent's motion for summary judgment on Petitioner's procedurally defaulted claims in Ground One.

### Grounds Two and Eight

In Ground Two, Petitioner argues that the PCR court erred in finding that his trial counsel was not ineffective when he asked the investigator about statements made by the jailhouse informants and did not object when the State moved to introduce written copies of those statements into evidence.  Further, in Ground Eight, Petitioner contends that the PCR appellate court erred in affirming the PCR court on this issue.  As discussed above, Petitioner also argues in Ground One that his trial counsel was ineffective for allowing the jailhouse informants' statements to be entered into evidence.

To be entitled to relief on an ineffective assistance claim, a petitioner must show that (1) trial counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability exists that but for counsel's error, the result of that proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984).  *Strickland* does not guarantee perfect representation, only a "'reasonably competent attorney.'"  *Id.* at 687 (quoting *McMann v. Richardson*, 397 U. S. 759, 770 (1970)).  There is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions in the case.  *Id.* at 690.  The review of ineffective assistance of counsel claims in federal habeas is not simply a new review of the merits; rather, habeas review is centered upon whether the state court decision was reasonable.  *See* 28 U.S.C. § 2254(d).  Additionally, each step in the

review process requires deference – deference to counsel and deference to the state court that previously reviewed counsel's actions:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal citations omitted).

As set out above, during the PCR hearing, Mr. Harbin testified that he recalled there being four jailhouse informants who provided statements. ECF No. 24-6 at 101. One informant was incarcerated in North Carolina, and three informants were "on the street in the Gaffney area." *Id.* at 101–02. Mr. Harbin testified that his investigator went to speak with the informant incarcerated in North Carolina, but this informant "was not going to be a witness that we wanted to put on the stand. And he . . . was speaking in kind of those terms. Kind of warning us off if you will." *Id.* at 102. Mr. Harbin was able to locate two of the remaining three informants. *Id.* Mr. Harbin testified as follows:

> One was very combative, … and did not want me on his property. … I knocked on his trailer door, and he started yelling and telling me I … wasn't allowed to talk to him, and I wasn't allowed to be there …. So, I didn't actually speak to him …. I just saw him. But certainly I took that as somebody that I was not gonna consider a potentially helpful witness.
>
> . . .
>
> The third one … [,] I was able to speak with him at his parent's house, and he was I'll say helpful, but extremely, extremely reluctant, and inconsistent, and … the manner in which he would

> have been helpful would have been to have to present to the jury
> some conspiracy that the police had concocted this, which I know
> that's not a … thing to be taken lightly.
>
> . . .
>
> [I]t was not something that I wanted to do unless that was something
> we could go full boar with, and, … I had simply no proof of that
> other than this kind of wishy washy younger apparently kind of
> scared and confused k*id.*

*Id.* at 102–03.  Mr. Harbin testified that the informants' statements were all inconsistent and contained information that did not fully comport with the evidence and investigation.  *Id.* at 103–04.  Mr. Harbin believed that one informant "would look like just a flatout liar."  *Id.* at 104.  Moreover, Mr. Harbin believed that if he could "pick apart [the other informants'] words on a statement and avoid the ability for them to rehabilitate themselves, that . . . might be the biggest win that we could get."  *Id*.  Mr. Harbin testified that he did not believe that Detective Burgess appeared overly credible before the jury, and at that point, Mr. Harbin did a risk versus benefit analysis and determined that he would intentionally open the door to the informants' statements.  *Id.* at 104–24.  Mr. Harbin wanted the State to be "boxed in" with the informants' statements and not call the informants to the stand because he was concerned that they would lie and rehabilitate themselves to correct their inconsistencies.  *Id.* at 104–24.  Mr. Harbin thought that their statements sounded "made up."  *Id*.  The prosecutors also testified that prior to Mr. Harbin opening the door to the informants' statements, their intent was to call the informants as witnesses in the trial.  ECF No. 24-7 at 142–44.  The informants had been subpoenaed and were present in the courtroom during the trial.  *Id*.  However, after Mr. Harbin opened the door, the prosecutors decided to proceed with "the strongest part of [their] case," which was "the DNA, the crime scene, and the forensics." *Id*.

In its order of dismissal, the PCR court found as follows:

The Court finds counsel's testimony as to this allegation is credible, particularly in reference to his strategic reason for opening the door to the admission of the various statements through Detective Burgess. Moreover, this Court finds counsel made an objectively reasonable strategic decision to question Detective Burgess as to these statements and open the door to their admission after thoughtful consideration of the facts of the case, his full investigation (including of these particular witnesses), and observing Detective Burgess during direct examination. Therefore, this Court finds counsel's performance was not deficient. *See Bowman v. State*, 422 S.C. 19, 809 S.E.2d 232 (2018) (in a capital PCR action, the Supreme Court determined that it was reasonable trial strategy for counsel to open the door to otherwise inadmissible evidence, after counsel thoroughly weighed the benefits and risks and decided to proceed forward with the strategy of opening the door, and moreover, that the State's response once the door was opened was proportional and confined). Additionally, this Court notes that by introducing the statements through Detective Burgess rather than calling each witness individually, the State elected not to call these witnesses and therefore, was unable to rehabilitate the witnesses or afford them an opportunity to clarify or correct discrepancies between the statements and the evidence presented, which was the intended goal of counsel's strategic decision. Counsel's performance was not deficient.

Moreover, this Court notes that Applicant cannot establish any requisite prejudice, as the substance of these statements would have clearly been introduced at trial through the individual witnesses had the statements not come in through Detective Burgess. The prosecutors testified these witnesses would have been called as witnesses during Applicant's trial and they would have attempted to clear up any discrepancies or inconsistencies when each witness was testifying. Therefore, Applicant is unable to establish any resulting prejudice from counsel's strategic decision to open the door to these statements through Detective Burgess.

ECF No. 24-9 at 18–18.

The Court of Appeals affirmed the PCR court, stating as follows:

We hold the PCR court did not err by finding Clark failed to prove he was prejudiced by trial counsel's alleged error. *See Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016) (holding a reviewing court "will uphold [the factual findings of the PCR court] if there is any evidence of probative value to support them"); *Strickland*, 466 U.S. at 694 (stating that to prove prejudice, a PCR applicant "must show that there is a reasonable probability that, but

> for [trial] counsel's unprofessional errors, the result of the
> proceeding would have been different"). The State presented
> extensive evidence of Clark's guilt, including DNA evidence
> recovered from Victim's body and fibers collected from the crime
> scene. Thus, evidence supports the PCR court's finding that Clark
> failed to demonstrate a reasonable probability that the results of his
> trial would have been different had trial counsel chosen not to open
> the door to the admission of the conflicting statements by cross-
> examining Detective Burgess about the statements' inconsistencies
> and the detective's failure to investigate the jailhouse witnesses'
> many credibility problems.

ECF No. 24-12 at 2.

The undersigned finds that the PCR appellate court's decision was not contrary to and did not involve an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. A reasonable argument exists in support of the PCR appellate court's determination that but for any alleged error from trial counsel, the result of the trial would not have been different. As recognized by Mr. Harbin and the prosecutors, the informants would have been called to the stand to testify if Mr. Harbin had not opened the door to their written statements. Accordingly, the substance of the informants' statements would have been introduced at trial regardless of Mr. Harbin opening the door.

Petitioner argues the PCR appellate court erred in finding that he was not prejudiced by his trial counsel opening the door to the informants' statements because the State did not present extensive evidence of his guilt. ECF No. 36 at 10–18. Specifically, Petitioner discusses that the Wolverine boots did not belong to him and the presence of a third-party's DNA and fingerprints. *Id*. However, as discussed above, even disregarding the boot fibers and unidentified DNA and fingerprints, the undersigned finds that a reasonable argument exists in support of the PCR appellate court's determination that there was extensive evidence of Petitioner's guilt. Additionally, Petitioner has failed to address the fact that the prosecutors were intending to call the

informants as witnesses during his trial before Mr. Harbin opened the door to their statements. Therefore, a reasonable argument exists to support the Court of Appeals' decision that Petitioner was not prejudiced by any alleged error, and this court should grant Respondent's motion for summary judgment on Ground Two, Ground Eight, and the related claim in Ground One.

### Grounds Three, Five, and Six

Respondent argues that Grounds Three, Five and Six should be dismissed because they raise issues pertaining to state law. ECF No. 48 at 19–20. As set out above, in Grounds Three and Six, Petitioner argues that the trial court erred in failing to give a complete jury instruction on circumstantial evidence. Petitioner has set forth a jury instruction from *State v. Logan*, 747 S.E.2d 444 (2013) that he would have preferred. ECF No. 1-8 at 2. Additionally, in Ground Five, Petitioner alleges that the trial court erred in failing to allow the defendant to introduce any evidence or mention anything about "Third-Party Guilt." Petitioner explains that the trial court granted the State's motion in limine, which prevented the defense from mentioning or introducing evidence regarding "Third-Party Guilt." ECF No. 1-10 at 1–3.

Because Petitioner is alleging errors of state law regarding jury instructions and evidentiary issues in these claims, they are not cognizable on federal habeas review. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts. The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. And we have repeatedly held that federal habeas corpus relief does not lie for errors of state law.") (emphasis in original) (internal citations and quotation marks omitted); *Estelle v. McGuire*, 502 U.S. 62, 63, 71–72 (1991) (noting that "it is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions" and "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief."); *Lynch v. Cartledge*, No. 6:16-cv-3939-RBH-KFM, 2018 WL 1531633, at *9 (D.S.C. Jan. 30, 2018) ("Whether the trial court erred in instructing the jury on state law matters is not within the purview of a federal habeas court."), *Report and Recommendation adopted by* 2018 WL 1524065 (D.S.C. Mar. 28, 2018); *James v. Warden of Lieber Corr. Inst.*, No. 2:12-cv-2836-JFA-BHH, 2014 WL 1234211, at *2 (D.S.C. Mar. 25, 2014) (finding that a petitioner was not entitled to habeas relief on his claim that the trial judge erred in allowing the State to introduce evidence connecting petitioner to an earlier burglary in violation of Rules 403 and 404 of the SCRE because Petitioner did "not identify any federal constitutional issue" in his habeas petition and "merely contends that the admission of evidence violated [SCRE]"); *Gaddy v. McCall*, No. 8:10-cv-1743-JFA-JDA, 2011 WL 4482592, at *5 (D.S.C. Sept. 27, 2011) ("This court agrees with the respondent that this claim cannot not be reviewed because it is a state law based claim and only noncompliance with federal law renders a state's criminal judgment susceptible to collateral attack in the federal courts.").

Therefore, this court should grant Respondent's motion for summary judgment on Grounds Three, Five, and Six.

### Ground Four

In Ground Four, Petitioner asserts that the trial court violated his Sixth Amendment rights by allowing the State to enter the written statements from the jailhouse informants into evidence without those individuals taking the stand. The undersigned finds that this claim is procedurally defaulted. Although Petitioner raised this claim in his *pro se* responses in his direct appeal, he did not raise a Confrontation Clause violation at trial so as to preserve the claim for appellate review. *See Wilder Corp. v. Wilke*, 497 S.E.2d 731, 733 (1998) (an issue cannot be raised for the first time

on appeal but must have been raised to and ruled upon by the trial judge to be preserved for appellate review). Further, Petitioner did not raise this claim in his PCR appeal. For the reasons discussed in Ground One, the undersigned also finds that Petitioner has failed to show cause and prejudice or a fundamental miscarriage of justice to excuse his default. Moreover, while Petitioner did raise this issue as an ineffective assistance of trial counsel claim in his PCR appeal, for the reasons already discussed, the undersigned finds that the PCR appellate court's decision was not contrary to and did not involve an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts. Therefore, this court should grant Respondent's motion for summary judgment on Ground Four.[3]

### Ground Seven

In Ground Seven, Petitioner argues that his PCR counsel was ineffective for not filing a Rule 59(e) motion concerning Petitioner's PCR claims despite Petitioner asking him to do so. However, "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under Section 2254." 28 U.S.C. § 2254(i); *see Martinez*, 566 U.S. at 17 (acknowledging that "§ 2254(i) precludes [a habeas petitioner] from relying on the ineffectiveness of his postconviction attorney as a ground for relief …") (citation and internal quotation marks omitted). Therefore, this court should dismiss Ground Seven.

---

[3] Even if this claim was preserved for federal habeas review, the undersigned finds that any violation of the Confrontation Clause was harmless based on the extensive evidence of Petitioner's guilt. *See Aiken v. Lewis*, No. 8:18-cv-02380-JFA-JDA, 2019 WL 6221383, at *9 (D.S.C. Mar. 29, 2019) ("A violation of the defendant's Sixth Amendment right to confront the witness is not *per se* reversible error if the error was harmless beyond a reasonable doubt.") (quoting *State v. Aiken*, No. 2011–187586, 2012 WL 10864184, at *1 (S.C. Ct. App. 2012)); *State v. Wiley*, 692 S.E.2d 560, 564 (Ct. App. 2010) ("Error is harmless when it could not reasonably have affected the result of the trial.").

## <u>CONCLUSION AND RECOMMENDATION</u>

Wherefore, based on the foregoing, the undersigned recommends that Respondent's motion for summary judgment (ECF No. 25) be GRANTED.

IT IS SO RECOMMENDED.

<u>s/Bristow Marchant</u>
United States Magistrate Judge

August 26, 2024
Greenville, South Carolina

***The attention of the parties is directed to the important notice on the following page.***

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
250 East North Street, Suite 2300
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).